**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jorge Alegre Gonzalez, et al., | No. CV 06-2485-PHX-MHM |
| Plaintiffs, | **ORDER** |
| vs. | |
| Tanimura & Antle, Inc., | |
| Defendant. | |

This is a civil action for damages, injunctive relief, and declaratory relief brought by fifty-six migrant farm workers from Arizona against Defendant agricultural employer, Tanimura & Antle, Inc., ("Tanimura & Antle" or "Defendant"), for alleged violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA"), the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801-1872, ("AWPA"), the Arizona Wage Payment Act, A.R.S. § 23-350 to 23-362, and California labor laws.

Now pending before the Court are Plaintiffs' Motion for Partial Summary Judgment (Doc. 73), Defendant's Motion for Summary Judgment (Doc. 51), and Defendant's Motion to Strike Plaintiffs' Affidavit Testimony (Doc. 96). These three motions are fully briefed. On July 28, 2008, Plaintiffs filed a Motion for Leave to File an Objection to Mike Antle's Affidavit, (Doc.114), to which Defendant responded (Doc. 116). After considering the papers submitted and the oral arguments asserted, the Court hereby issues the following Order.

**FACTUAL BACKGROUND**

Plaintiffs are 56 seasonal agricultural workers who work or worked for Defendant, Tanimura & Antle, Inc. ("Tanimura & Antle" or "Defendant"), picking lettuce or broccoli primarily in Yuma County, Arizona.  Tanimura & Antle has been in the farming business since 1982. Some Plaintiffs have worked for Defendant all of these years. Three seasons are at issue. These seasons include the 2003-2004 (Season 1); 2004-2005 (Season 2); and 2005-2006 (Season 3).   The harvest period for each of these commodities is between approximately November and March.

Each morning most Plaintiffs reported to the bus parking lot that Defendant leases in San Luis, Arizona.  (Plaintiffs' Statement of Facts ("PSOF"), ¶¶ 1, 2, 4).  San Luis is a town of approximately 19,000 people on the Mexican border.  The majority of the Plaintiffs live in Mexico and walk across the border to the company parking lot, which is located approximately one-half mile from the border.  To cross the border often takes 45 minutes to an hour.

The company bus was optional.  (Defendant's Statement of Facts ("DSOF") ¶ 22).  However, nearly all of the  Plaintiffs rode the company buses to the fields.  (PSOF ¶ 4). Company policy strongly encourages harvesters to ride the company buses, and permission must be sought and granted by the supervisor before a harvester is permitted to park on particular ranches.  (PSOF ¶ 3).  In fact, Defendant's employee handbook states that some ranches are not located near public roads and no parking is available on the ranch.  (PSOF ¶ 3).

Each day, Defendant set Plaintiffs' report time to the bus parking lot for the following day.  (PSOF ¶ 2).  There is a factual dispute as to what time the harvesters are told to report to the parking lot.  Plaintiffs state that the time was often set at approximately 6:00 a.m. (PSOF ¶ 1) to ensure that the harvesters were ready to begin harvesting at sunrise. Defendant, on the other hand, states that the report time varied depending on the weather forecast and was often later than 6:00 a.m. (DSOF ¶¶ 83, 106-109).   Upon arrival at the

parking lot, when weather was not an issue, the harvesters were loaded onto Defendant's company buses for transport to the fields anywhere from 10 to 40 miles away from the parking lot.  (PSOF ¶ 4).

During the winter months, when minimum temperatures dip into the freezing range, ice regularly forms on the fields and on the produce to be harvested.  (PSOF ¶ 6).  On icy days, the produce cannot be harvested until the ice melts, as the broccoli and lettuce will be damaged if picked while partially frozen.  (PSOF ¶ 9).  During the coldest parts of the winter, Defendant's harvest supervisors inspect the fields for ice beginning at 4:00 a.m.  (Defendant's Statement of Facts in Opposition, "DSOFIO" ¶ 10).

If the weather was forecasted to be cold, such that there might be a freeze the next day, Plaintiffs would be given a later start time on the day before  (DSOFIO ¶¶ 81-83, 92, 106-09).  On these days, the start time given was usually about 9:00 a.m., and Plaintiffs were instructed to call in to the foremen or the human resources office in Yuma to confirm their schedules and see if a new later start time had been set.  (Id. at 82, 84-92, 97).

Harvesters could call in to their foreman and employees at the human resources office as early as 5:30 a.m. to confirm their start time. (DSOFIO ¶ 84-92, 97).  The determination of the presence of black ice generally is made by 5:30 a.m. and white ice generally is discovered around sunrise, which occurs in Yuma in the winter between 7:20 and 7:40 a.m.[1] (DSOFIO ¶ 97).  When the ice determination is not made until sunrise, the harvesters riding the bus, often time, have arrived at the parking lot by the  time the determination is made.  (PSOF ¶ 10).  In these instances, the harvest supervisors radio the bus drivers and direct them to wait and not to leave the parking lot.  (PSOF ¶ 10).  It may take two to three hours for the ice to melt.  (PSOF ¶ 12).  When this happens, the harvesters are given a new time to report to the buses.  (DSOFIO ¶ 14).

---

[1] Plaintiffs ask the Court to take judicial notice of the fact that sunrise in Yuma in the winter occurs between 7:20 and 7:40 a.m., which the Court hereby grants.

1    Plaintiffs were not required to wait in the parking lot for the ice to melt and the new

2 start time.[2] (DSOFIO ¶ 87-92, 97-102). However, because many Plaintiffs had walked to

3 the parking lot, they would stay in the general vicinity of the parking lot while they waited

4 for the new bus departure time. (PSOF ¶ 14). Sometimes the harvesters would go to the

5 nearby Circle K to buy coffee or breakfast. (Id.) Some harvesters would play cards, dice,

6 or soccer. (DSOFIO ¶ 103). Other harvesters sold tamales. (DSOF ¶ 32). Another option

7 was for the harvesters to drive to the field at the later start time. (DSOFIO ¶ 84-91). Some

8 harvesters would not report to the parking lot at all but, instead, would drive to the field,

9 obtain the new start time from the foreman, and then return to the field at the later time.

10 (DSOFIO ¶ 98).

11    Tanimura & Antle did not maintain records of how much time its employees waited

12 for the later start time. Nor did it include that information in its employment records as to

13 each Plaintiff. (PSOF ¶ 16).

14    During the relevant harvest periods, Plaintiffs were paid wages of $8.25 per hour. In

15 addition, they were to receive what Tanimura & Antle call the Group Production Incentive,

16 or "GPI." (PSOF ¶ 18). Tanimura & Antle sets the GPI at its discretion. (Id.). Tanimura

17 & Antle's Human Resources Director explained the GPI as follows:

18    The group production incentive is a price that we give per production of – it
      could be box, it could be bin. And its earned by the employees working
19    together as a group and we have a computation at the end of the day of how
      many boxes were taken, for example, out of a field, and then we . . . count
20    them up with a fixed amount that we've already communicated to the
      employee of what that amount is and then we add up the hours worked and a
21

22

23

24    [2] In their Motion for Partial Summary Judgment, Plaintiffs asserted that Defendant
      *required* them to wait in the parking lot for the ice to melt. However, the only evidence that
25 supports a finding that Plaintiffs were *required* to wait in the bus parking lot is the affidavits
   of Messrs. Arce, Tapia, and Espinoza. Since filing their Motion for Partial Summary
26 Judgment, Plaintiffs have withdrawn these affidavits. Thus, the evidence does not support
   finding that Plaintiffs were *required* to wait in the parking lot.
27

28

amount which that is.  The employee will get the difference between their base hourly wage and the GPI.

(PSOF ¶ 18).  The payroll receipts provided each Plaintiff with his weekly check do not contain the GPI rate per box or bin for the given pay period.

In their Motion for Partial Summary Judgment, Plaintiffs request that this Court issue a declaration stating that Defendant's failure to compensate Plaintiffs for time they spent waiting in the fields and parking lot for ice to melt is compensable.  Plaintiffs also seek summary judgment on their Migrant and Seasonal Agricultural Worker Protection Act ("AWPA") claim.

In its Motion for Summary Judgment, Defendant contends that no genuine issue of material fact exists as to any of Plaintiffs' five causes of action[3] and requests that the Court grant summary judgment in its favor.  It appears that both Motions center around whether Plaintiffs' wait time was compensable.

## DISCUSSION

## I.   MOTION TO STRIKE PLAINTIFFS' AFFIDAVIT TESTIMONY

Defendant has moved to strike the affidavit testimony of Plaintiffs Manual Arce, Francisco Tapia, and Antonio Espinoza submitted by Plaintiffs in support of Plaintiffs' Motion for Partial Summary Judgment and Plaintiffs' Response to Defendant's Motion for Summary Judgment.  Defendant also seeks to strike Plaintiffs' corresponding statement of facts that are based on these three affidavits.

In response, Plaintiff agreed to withdraw the affidavits at issue.  Plaintiff also agreed to withdraw Paragraph 77 from its Statement of Controverted Facts filed in Opposition to

---

[3]  Plaintiffs' five causes of action include the following:  (1) violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*; (2) violation of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801 *et seq.*; (3) violation of the Arizona Wage Payment Act, A.R.S. § 23-350 *et seq.*; (4) breach of contract; (5) violation of California labor laws and regulations.  Plaintiffs have agreed to dismiss their sixth cause of action for negligent hiring and supervision.

Defendant's Motion for Summary Judgment and Paragraph 14 of their Statement of Material Facts in support of their Motion for Partial Summary Judgment. However, Plaintiffs argue that Paragraphs 1, 4, 10, and 14 of their Statement of Material Facts and Paragraphs 64, 67, and 73 of their Statement of Material Facts should remain because they are based on other evidence outside of the withdrawn affidavits.

In its Reply, Defendant argues that in addition to eliminating Paragraph 14 of Plaintiff's Statement of Material Facts and Paragraph 77 of Plaintiff's Statement of Controverted Facts, other paragraphs should be stricken because they are not supported by admissible evidence. Specifically, Defendant contends, Paragraph 1 of Plaintiffs' Statement of Material Facts and Paragraph 64 of Plaintiff's Statement of Controverted Facts, in which Plaintiffs claim they "were required to report to Tanimura & Antle's parking lot in San Luis, Arizona at approximately 6:00 a.m. to catch the company bus to the fields" is only supported by the now withdrawn Arce, Tapia, and Espinoza affidavits. The Court agrees. The Dominguez Deposition states that the buses generally leave at 6:00 a.m. but states nothing about the harvesters being *required* to ride a company bus. Plaintiff Arce stated in his deposition that he was not required to ride the company bus, but rather that he chose to ride the bus in order to save money on gas. (Arce Deposition, Defendant's Motion to Strike, Exh. E, pp. 18-20). Plaintiff Dagoberto Ruiz does not state in his deposition, cited by Plaintiffs, that riding the bus was required and the Sorano Deposition states that the buses are optional. (Dahlquist Affidavit, Exh. E, Serrano depo., p.9). Thus, there is insufficient admissible evidence to support a statement that Plaintiffs were *required* to report to the parking lot at 6:00 a.m. Accordingly, the Court will disregard the statements that Plaintiffs were required to ride the bus.

Similarly, Defendant contends that Paragraph 4 of Plaintiffs' Statement of Material Facts and Paragraph 67 of Plaintiffs' Statement of Controverted Facts should be stricken because they are not supported by the admissible evidence now that the Arce, Tapia, and Espinoza Affidavits have been withdrawn. Paragraph 4 provides that, "[m]ost harvesters ride

the buses to the fields, which are between 10 and 40 miles from the parking lot.  The harvesters are discouraged from using their own vehicles."  Paragraph 67 provides an additional allegation that, "[t]hose who drive their own vehicles still have to wait at the parking lot to follow the buses as they don't know the location of the fields in advance." Though Plaintiff Ramiro stated in his deposition that cars sometimes followed the bus, he also stated that the reason for this was that the harvesters did not know the location of a *particular* field.  (Dahlquist Affidavit, Exh. T, Ramiro depo., p.50).  He did not state that the reason was because the harvesters do not know the location where they would be working that day.  Indeed, there is evidence to show that the previous day, the harvesters were informed of what field they would be working the following day.  (See Arce depo., pp. 17-18, Def.'s Mot. to Strike, Exh. E; Defendant's Statement of Facts in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("DSOFIO") ¶¶ 78 & 80).  Therefore, the Court will disregard the assertions in Paragraphs 4 and 67 that harvesters were discouraged from driving, and that they had to wait at the bus parking lot to learn the location of the field in which they were working that day.

Finally, Defendant asserts that Paragraph 10 of Plaintiffs' Statement of Material Facts and Paragraph 73 of Plaintiffs' Statement of Material Facts, alleging that "harvesters must wait in the parking lot until the buses leave" must be stricken for lack of admissible support in the record.  Plaintiffs cite the Dominquez, Serrano, and Esparza depositions.  However, the deposition testimony cited does not support this allegation.  Each of these witnesses testified that if ice delayed the start time, the harvesters were given a new start time at which to report back.  Therefore, the Court will disregard Paragraph 10 of Plaintiffs' Statement of Material Facts and Paragraph 73 of Plaintiffs' Statement of Controverted Facts. Accordingly, Defendant's Motion to Strike Plaintiffs' Affidavit Testimony is granted. The Court will disregard the corresponding select portions of Plaintiffs' Statements of Material Facts and Statement of Controverted Facts.

1    **II.    PLAINTIFFS' EVIDENTIARY OBJECTIONS**

2        Plaintiffs argue that Paragraphs 2, 4, 10, 14, 16, 17, and 19 of Carmen Ponce's

3    Affidavit should be stricken.  Plaintiffs claim that Ms. Ponce's statements in these Paragraphs

4    are not based on personal knowledge and that a number of the statements are based on

5    inadmissible hearsay.

6        Defendant asserts that Plaintiffs' Objection disregards Ms. Ponce's declaration in her

7    Affidavit that she has personal knowledge of the facts set forth therein and misrepresents the

8    record by omitting relevant deposition testimony that establishes that Ms. Ponce has personal

9    knowledge of the facts.  During her deposition, Ms. Ponce testified that she is the Vice

10   President of Human Resources and that her duties include overseeing the administration of

11   Tanimura & Antle's personnel operations, including both agricultural and office employees,

12   Tanimura & Antle's payroll department, company policies, employee benefits, and until

13   recently, Defendant's safety operations.  (Ponce depo., pp. 5-7, Defendant's Response to

14   Plaintiff's Objections to Evidence, Exhibit 1).   Ms. Ponce is the custodian of Tanimura &

15   Antle's payroll records.  Id. at pp. 100.  Ms. Ponce testified regarding her first-hand

16   knowledge of the process of how Tanimura & Antle pays its harvest employees each week.

17   Id. at 22-27.  Ms. Ponce testified that she supervises Tanimura & Antle's payroll manager,

18   Lorraine Ingram.  Id. at p. 22.  At Ms. Ponce's request, Ms. Ingram performed a review, and

19   queries, of Plaintiffs' payroll records and reported back to Ms. Ponce that Plaintiffs were

20   timely paid all wages due.  Id. at pp. 25-26, 50, 89-91.  Ms. Ponce drafted portions of

21   Tanimura & Antle's Harvest Employee handbook, which sets forth company policies, and

22   is provided to employees annually at their orientation meetings.  Id. at 50-51. Ms. Ponce also

23   testified regarding Tanimura & Antle's open door policy, and that she has met with harvest

24   employees both in the Yuma community office, out in the fields, and during other meetings.

25   Id. p. 8.

26       With regard to summary judgment, a party does not necessarily have to produce

27   evidence in a form that would be admissible at trial, as long as the party satisfies the

28                                                    - 8 -

1    requirements of Federal Rules of Civil Procedure 56.  Celotex Corp. v. Catrett, 477 U.S. 317,

2    324 (1986).  With respect to evidence submitted by affidavit, Rule 56(e), Fed.R.Civ.P.,

3    requires that the affidavits "shall be made on personal knowledge, shall set forth such facts

4    as would be admissible in evidence, and shall show affirmatively that the affiant is competent

5    to testify to the matters stated therein."

6        Ms. Ponce's affidavit testimony is based on her experience and knowledge as Vice

7    President of Human Resources ("V.P. of H.R.") and supervisor of the payroll department for

8    Tanimura & Antle.  In her capacity as V.P. of H.R., and supervisor of the payroll department,

9    Ms. Ponce has personal knowledge that Plaintiffs were timely paid all wages for work

10   performed for Tanimura & Antle.  Ms. Ponce can properly testify to acts of her payroll

11   department in confirming that Plaintiffs were paid all of their wages.    In re Kaypro, 218

12   F.3d , 1070, 1075 (9th Cir. 2000).  Moreover, Ms. Ponce testified that she personally

13   reviewed documents and records reflecting the facts that Plaintiffs' wages were paid and that

14   she is familiar with the results of the review and query of payroll records conducted payroll

15   manager, Lorraine Ingram, whom Ms. Ponce supervises.

16       Plaintiffs rely on Block v. City of Los Angeles, 253 F.3d 410, 419 (9th Cir. 2001),

17   where the court found that the declarant's affidavit was not based on personal knowledge

18   because the declarant did not review the business records and relied on information from

19   personnel officers.  Plaintiffs analogize Block to the instant case by arguing that Ms. Ponce's

20   statements are inadmissible because her knowledge is based not on her own review but on

21   the oral statements given to her from her assistant Ms. Ingram.  In Block the inadmissible

22   affidavit was submitted by the city administrative analyst who lacked oversight knowledge

23   of the facts included in his affidavit.  Id.

24       Plaintiffs have overlooked a number of key distinctions between this case and Block.

25   First, Plaintiffs fail to acknowledge Ms. Ponce's deposition testimony in which she clearly

26   establishes that she has personal knowledge of the facts to which she testified in her affidavit.

27   Next, Plaintiffs ignore the case law declaring that personal knowledge can be inferred from

28                                             - 9 -

1    a declarant's position within a company.  See Self-Realization Fellowship Church, 206 F.3d

2    1322, 1330 (9th Cir. 2000) ("As a corporate officer of SRF, Ananda Mata could be expected

3    to know the identity of SRF employees and their tasks."); Barthelemy v. Air Line Pilots

4    Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990) (CEO's personal knowledge of various corporate

5    activities could be presumed).  Thus, the Court finds sufficient evidence in the record to

6    support personal knowledge of the statements set forth in Ms. Ponce's affidavit.

7    Accordingly, Plaintiffs' Objections to the Evidence are overruled.[4]

8    **III.    OBJECTION TO MIKE ANTLE'S AFFIDAVIT**

9           On July 28, 2008, Plaintiffs filed a Motion for Leave to File an Objection to Mike

10   Antle's Affidavit, to which Defendant responded.  Plaintiffs seek leave to file an untimely

11   objection to Mr. Antle's affidavit because Mr. Antle's affidavit was included in the exhibits

12   Defendant attached to its Response to Plaintiffs' Motion for Partial Summary Judgment

13   without having previously disclosed the affidavit.  The Court hereby grants Plaintiffs'

14   Motion for Leave and will consider Plaintiffs' Objection to Mike Antle's Affidavit.

15          Rule 26(a)(1)(A)(i) states that parties must disclose all documents "that the disclosing

16   party may use to support its claims or defenses."  This duty continues as set forth in Rule

17   26(e)(1), which states that "[a] party who has made a disclosure under Rule 26(a) . . . must

18   supplement or correct its disclosure or response . . . in a timely manner if the party learns that

19   in some material respect the disclosure or response is incomplete or incorrect, and if the

20   additional or corrective information has not otherwise been made known to the other parties

21   during the discovery process or in writing . . ."  Rule 26(a)(3)(B) states that objections to

22   disclosures must be made within 14 days of receiving the disclosure.

23          Rule 6(b), Fed.R.Civ.P., governs extending deadlines and states that "[w]hen an act

24   may or must be done within a specified time, the court may, for good cause, extend the time

25   ─────────────────

26        [4]  During Oral Argument Plaintiffs indicated an intent to file an objection to Ms.
     Ponce's affidavit based on her recently-filed Notice of Appearance as counsel for Defendant.
27   The Court will consider any such objection if and when filed.

28                                          - 10 -

1   . . . on motion made after the time has expired if the party failed to act because of excusable
2   neglect."

3       Defendant opposes Plaintiffs' Motion for Leave.  Defendant contends that Plaintiffs'
4   proposed Objection is over five months late and that Plaintiffs cannot meet the Rule 6(b)
5   standard for an enlargement of time to object, *i.e.*, Defendant asserts that Plaintiffs can show
6   neither good cause nor excusable neglect.  Defendant points out that Mr. Antle's affidavit
7   testimony is cited and discussed in both Defendant's response to Plaintiffs' Motion for Partial
8   Summary Judgment and in Defendant's Reply to Plaintiffs' Response to Defendant's Motion
9   for Summary Judgment and is cited in nineteen of Defendant's Statements of Fact in
10  opposition to Plaintiffs' Motion for Partial Summary Judgment.  Thus, Defendant contends,
11  based on the numerous citations to Mr. Antle's affidavit, there is no good cause for Plaintiffs'
12  not having seen the affidavit.  Defendant also asserts that Plaintiffs' "carelessness in not
13  reading Defendant's briefs or Defendant's Statement of Facts in Opposition, or reviewing
14  Defendant's exhibits, all of which reference Mr. Antle's Affidavit, does not constitute
15  'excusable neglect.'" Def's Response to Plaintiffs' Motion for Leave at p. 3.

16      In support of its position that Plaintiffs have now shown excusable neglect, Defendant
17  cites Almarez v. Superior Court for the County of Pima, 146 Ariz. 189, 192, 704 P.2d 830,
18  833 (App. 1985); Lederer v. Hargraves Technology Corp., 256 F.Supp. 2d 467, 469-70
19  (W.D.N.C. 2003); Davidson v. Keenan, 740 F.2d 129, 132 (2nd Cir. 1984); Coleman v. Blue
20  Cross Blue Sheild of Kansas, 487 F.Supp. 2d 1225, 1233 (D. Kansas 2007); Poulin v. E.I.
21  DuPont DeNemours, 883 F.Supp. 894, 895 (W.D.N.Y. 1994); and Slaughter v. Southern Talc
22  Co., 919 F.2d 304, 307-08 (5th Cir. 1990), only one of which, the Arizona Court of Appeals
23  case of Almarez, carries any authority here.

24      Nevertheless, Defendant fails to recognize that the Rule 6(b) standard for enlargement
25  of time to object relates to the time a party has to object once affidavits are disclosed
26  pursuant to Rule 26.  However, Plaintiffs contend, and Defendant does not argue to the

27

28

1   contrary, that Defendant never disclosed Mr. Antle's affidavit as is required by Rule 26.

2   Thus, enlargement under Rule 6(b) is not a factor here.

3       Defendant also asserts that it complied with Rule 56(e)(2) by submitting Mr. Antle's

4   affidavit as part of these summary judgment proceedings. Rule 56(e)(2) provides in pertinent

5   part as follows:

6       When a motion for summary judgment is properly made and supported, an
        opposing party may not rely merely on allegations or denials in its own
7       pleading; rather, its response must – *by affidavits* or otherwise provided in this
        rule – set out specific facts showing a genuine issue for trial . . . .
8

9   (emphasis added). Citing Rule 56(e)(2), Defendant points to the terminology that a summary

10  judgment motion may be supported "by affidavits" as meaning that it can simply create an

11  affidavit to support a summary judgment motion without being required to disclose it

12  pursuant to Rule 26.

13      However, Defendant has not cited, nor is the Court aware of, any authority that

14  provides that Rule 56(e)(2) actually authorizes affidavits that have not yet been disclosed,

15  nor that it overrides the Rule 26 requirement that all affidavits must be disclosed. Thus,

16  Defendant's argument on this point fails.

17      At any rate, the Court rules that to the extent that the Court relied on Mr. Antle's

18  affidavit, Plaintiffs' Objection is overruled. To the extent that the Court did not rely on Mr.

19  Antle's affidavit, Plaintiffs' Objection is overruled as moot.

20  **IV.    CROSS MOTIONS FOR SUMMARY JUDGMENT**

21      **A.    LEGAL STANDARD**

22      Summary judgment is properly granted when no genuine and disputed issues of

23  material fact remain, and when, viewing the evidence most favorably to the non-moving

24  party, the movant is clearly entitled to prevail as a matter of law. Fed.R.Civ.P. 56; Celotex

25  Corp., 477 U.S. at 322-23; Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

26  1987).

27

28                                    - 12 -

1    Initially, the moving party bears the burden of showing that there is no material factual
2    dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported
3    by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d
4    at 1289.  The court must draw all reasonable inferences in favor of the party against whom
5    summary judgment is sought.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
6    574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th
7    Cir. 1991).

8    The burden then shifts to the non-movant to establish the existence of material fact.
9    Celotex, 477 U.S. at 323.  The non-movant "must do more than simply show that there is
10   some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts
11   showing that there is a genuine issue for trial.'"  Matsushita, 475 U.S. at 586-87 (quoting
12   Fed.R.Civ.P. 56(e)).

13   A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could
14   return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
15   248 (1986).  The non-movant's bare assertions, standing alone, are insufficient to create a
16   material issue of fact and defeat a motion for summary judgment.  Id. at 247-48.

17   **B.    FAIR LABOR STANDARDS ACT**

18   In their Motion for Partial Summary Judgment, Plaintiffs assert that Defendant should
19   have compensated them for the time they spent waiting for the ice to melt off the fields.
20   Plaintiffs contend that the Defendant hired them and then set a start time that, in the winter
21   months, often resulted in Plaintiffs having to wait in the parking lot or in the field before they
22   could perform the harvesting for which they were hired.  Plaintiffs assert that because of the
23   remote location of the parking lot and the fields, and because they may need to catch the
24   company bus, or begin working in the field, at a moment's notice, they could not participate
25   in activities for their own benefit.  Thus, Plaintiffs claim, because the wait was required and
26   was for Defendant's benefit, Plaintiffs should have been compensated for the time they spent
27   waiting both in the parking lot and in the field.

28

1        On the other hand, in its Response to Plaintiffs' Motion for Partial Summary

2 Judgment and in its Motion for Summary Judgment on all claims, Defendant claims that the

3 wait time is not compensable work time for three reasons.  First, Defendant claims the wait

4 time is not compensable because the ice in the field was an Act of God beyond Defendant's

5 control and Defendant cannot be responsible for such unforeseeable acts.  Next, Defendant

6 asserts that the parties agreed that wait time would not be compensated. Finally, Defendant

7 argues that it is not responsible to pay Plaintiff's wait time because Plaintiffs were not

8 required to wait.

9        Under the FLSA, "employers must pay employees for all hours worked." Alvarez v.

10 IBP, Inc., 339 F.3d 894, 902 (9th Cir. 2003), rev'd on other grounds, 546 U.S. 21 (2005).

11 The Supreme Court defines "work" broadly as "all physical or mental exertion (whether

12 burdensome or not) controlled or required by the employer and pursued necessarily and

13 primarily for the benefit of the employer." Tennessee Coal, Iron, and Railroad Co. v.

14 Muscoda Local No. 123, 321 U.S. 590, 598 (1944).

15        The mandate includes a requirement that the employer compensate its employees for

16 time it engages employees to wait. Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944);

17 Owens v. Local No. 169, Ass'n of W. Pulp and Paper Workers, 971 F.2d 347, 350 (9th Cir.

18 1992) (citing Armour & Co. v. Wantock, 323 U.S.126, 132 (1944)).  Time spent waiting is

19 compensable when the waiting time is spent primarily for the benefit of the employer and its

20 business. Skidmore, 323 U.S. at 140; Owens, 971 F.2d 350.  In determining who is

21 benefitted by wait time, courts consider the following two factors:  (1) the agreement

22 between the parties; and (2) the degree to which the employee is free to engage in personal

23 activities. Owens, 971 F.2d 350.

24 ///

25 ///

26 ///

27 ///

28

## 1.   ACT OF GOD

Defendant cites 29 C.F.R. § 500.72(a),[5] and argues it should not be responsible to compensate Plaintiffs because the ice in the fields was an unforeseeable Act of God that was beyond Tanimura & Antle's control.  The Court does not find this argument compelling.

First, an Act of God is defined as "[a]n overwhelming, unpreventable event caused exclusively by forces of nature, such as an earthquake, flood, or tornado."  Black's Law Dictionary, (8th ed., 2004).  Not every strong storm constitutes an Act of God.  Southern Pac. Co. v. Loden, 19 Ariz. App. 460, 466, 508 P.2d 347, 353 (App. Div. 2 1973).  Rather, the issue turns on whether the storm condition was unforeseeable or of greater intensity than other such storms.  Id.  See 1 AmJur.2d Act of God § 1 (1962) ("An event may be considered an Act of God when it is occasioned exclusively by the violence of nature."); see e.g., W.M.G. Roe & Co., v. Armour & Co., 370 F.2d 829, 830 (5th Cir. 1967) (held that a once-in-many-years freeze in Florida that damaged fruit trees was an Act of God); Zizzo v. Railway Express Agency, Inc., 131 F. Supp. 326, 328 (D. Mass. 1955) (held that unusually severe combination of snow and cold weather was an Act of God); Feathers v. Wilson, 157 Ga.App. 753, 278 S.E. 2d 434 (Ga.App. 1981) (found that trial judge was correct to define an Act of God as "some unnatural phenomena and totally unexpected in the natural world, such as lightning striking places where lightning usually does not strike, a meteor falls, a tidal wave and earthquake").

---

[5] Section 500.72(a) of the Code of Federal Regulations states as follows:

The Act prohibits farm labor contractors, agricultural employers and agricultural associations from violating, without justification, the terms of any working arrangements they have made with migrant or seasonal agricultural workers.  Normally, "without justification" would not include situations in which failure to comply with the terms of any working arrangements was directly attributable to acts of God, due to conditions beyond the control of the person or to conditions which he could not reasonably foresee.

29 C.F.R. § 500.72(a).

Though Defendant claims that the ice on the fields was an Act of God, the ice actually was foreseeable because it happened quite often in Yuma during the winter months.  In fact, Yuma's seasonal morning ice, which was so light that it did not damage uncovered lettuce and broccoli plants and burned away by mid to late morning, is predictable.  Indeed, when the conditions were ripe for ice, Tanimura & Antle's foremen and supervisors testified that by afternoon, they would determine the need for later start times the next morning based on their belief that ice would form.  (DSOFIO ¶ 7).  Moreover, the ice on the fields was not of any greater intensity than the normal, average weather experienced in the area during the winter months and cannot be compared to an earthquake, flood, or tornado.  Accordingly, the ice on the lettuce and broccoli plants was not an unforeseeable Act of God.  Indeed, because of the predictability of the ice, Defendant could have set a later start time during the winter months when the temperature often drops low enough for ice to form in the fields.  Thus, this factor does not support Defendant's position.

## 2.    AGREEMENT

Parties to an employment agreement can agree as to whether waiting time will be compensated.  Berry v. County of Sonoma, 30 F.3d 1174, 1180-81 (9th Cir. 1994).  The inquiry regarding the "agreement" factor is significant to the extent that the terms of the agreement may assist the trier of fact in determining whether the parties characterized the time spent waiting on-call as actual work.  Id., at 1181.  However, such agreements are not controlling as to the character of the uncompensated time at issue.  Id.  Moreover, waiver of statutory wages under the FLSA by agreement is not permissible.  Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 (1945).  In fact, such an agreement to waive wages is contrary to the purpose of the FLSA.  Id.

Defendant argues that the parties had expressly agreed that any wait time prior to commencing work in the field, and any wait time due to "an Act of God or matters outside Defendant's control," would not be compensated.  Defendant points to the Tanimura & Antle Harvest Employee Handbook, Section II(G), which provides that, "[w]ork time does not

begin until the employee starts work in the field.  Employees are not paid for time spent traveling to and from work in the field, whether on Company provided transportation or otherwise."  In addition, Section III(E)(3) of the Employee Handbook also provides that reporting and standby pay provisions pertaining to employee wait time are not applicable when "the interruption of work is caused by an Act of God or other cause not within [Tanimura & Antle's] control."  Defendants contend that Plaintiffs acknowledged and agreed to these terms when they were hired.

Defendant cites Hyman v. Efficiency, Inc., 167 N.C.App. 134, 605 S.E.2d 254, 261 (N.C. App. 2004), in support of its position that an agreement can make wait time not compensable.  However, Hyman is distinguishable from the instant case because in Hyman the workers signed an agreement stating that "once you have been given a ticket, you are completely relieved of duty and are free to use the time between getting assigned a time ticket and the time the job starts effectively and for your own purposes."  Id. at 261.  There was no such express agreement about what Plaintiffs here could do with their time while waiting for the later start time.

Plaintiffs, on the other hand, claim that the parties did not have an agreement that Plaintiffs would not be compensated for wait time.  Plaintiffs contend that the evidence Defendant sets forth of an express agreement – Section II(G) of the Tanimura & Antle Harvest Employee Handbook – must be taken in the context of travel time and, therefore, does not demonstrate an agreement regarding wait time.  In fact, Section II(G) is entitled "Free Bus Transportation" and the entire one-paragraph section relates to the optional free transportation.  There is one sentence toward the end of the paragraph that states that "[w]ork time does not begin until the employee starts work in the field." but this sentence seems to relate to the transportation discussion before and after it.  In fact, the sentence immediately following states that "[e]mployees are not paid for time spent traveling to and from work in the field, whether on Company provided transportation or otherwise."  It seems clear that Secvtion II(G) of the Tanimura & Antle Employee Handbook relates to travel to the fields

1   and the optional bus.  The sentence about not being paid for travel is inapplicable here

2   because Plaintiffs do not assert a claim for travel time pay.

3          Plaintiffs claim that to the extent there was an express agreement, Section III(E)(1)

4   of the Employee Handbook is more relevant.  Plaintiffs assert that this section states that

5   "[a]n employee who is required to report for work and does report, but is not put to work .

6   . . shall be paid."  However, Plaintiffs have taken the quotation out of context.  Section

7   III(E)(1) states more fully that an employee who reports to work but is not put to work "shall

8   be paid half the usual or scheduled day's work."  Thus, this Section addresses paying

9   between two and four hours pay to employees who show up for work but are not given work

10  that day.  Therefore, this Section is inapplicable here.  There does not appear to be evidence

11  of an express agreement regarding compensation for wait time.

12         Defendant also asserts that there was an implied agreement that wait time was

13  compensable because the Plaintiffs continued to work after complaining to their supervisors

14  about the wait and being put on notice of the Tanimura & Antle policy regarding wait time.

15  In support of this position, Defendant cites Vega v. Gaspar, 36 F.3d 417 (5th Cir. 1994);

16  Owens, 971 F.2d 347; and Rousseau v. Teledyne Movibile Offshore, Inc. 805 F.2d 1245 (5th

17  Cir. 1986).  In Vega, the Fifth Circuit found that the district court did not err in finding no

18  implied agreement when workers were hired and rehired each day.  Vega, 36 F.3d at 427.

19  In Owens the Ninth Circuit found the plaintiffs had impliedly agreed to a newly established

20  call-in policy by continuing to work under the new terms.  Owens 971 F.2d at 357.  In

21  Rousseau the Fifth Circuit upheld the district court's finding of an implied agreement that

22  plaintiffs would not be paid for time spent living on a barge when not engaged in physical

23  labor.  Rousseau, 805 F.2d at 1248.  The facts there demonstrated that representatives of the

24  employer testified about informing the employees of the policy and many employees

25  admitted awareness of the policy.  Id.  The facts in Vega are dissimilar from the instant case

26  because, here, the employees are not day laborers.  Therefore, Vega does not provide insight

27  into the possibility of an implied agreement.  Owens and Rousseau are distinguishable from

28

1   the instant case.  Here, Plaintiffs were given a time to report to work and then had to wait an

2   hour or two before commencing work.  They were not merely required to call in on occasion,

3   nor were they aware of any policy regarding not being compensated for wait time.

4   Moreover, as stated above, an agreement to waive statutory wages under the FLSA is not

5   permissible.  Brooklyn Sav. Bank, 324 U.S. at 707.  The Court finds insufficient evidence

6   of an implied agreement regarding whether wait time would be compensated.

7               **3.    PERSONAL ACTIVITIES**

8       The proper inquiry regarding the "personal activities" factor, is "whether an employee

9   is so restricted during on-call hours as to be effectively engaged to wait."  Berry, 30 F.3d at

10  1182.  Though the instant case is not an on-call case, such cases can help provide direction

11  nonetheless.  In Owens, the Ninth Circuit "enumerated an illustrative list of factors to

12  consider in gauging the extent to which employees could pursue personal activities during

13  the course of their on-call shifts."  Brigham v. Eugene Water & Elec. Bd, 357 F.3d 931, 936

14  (9th Cir. 2004) (quoting Owens, 971 F.2d at 351).  Such factors include the following:  (1)

15  whether there was an on-premises living requirement; (2) whether there were excessive

16  geographical restrictions on employee's movements; (3) whether the frequency of calls was

17  unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5)

18  whether the on-call employee could easily trade on-call responsibilities; (6) whether the use

19  of a pager could ease restrictions; and (7) whether the employee had actually engaged in

20  personal activities during call-in time.  Brigham 357 F.3d at 936.  No one factor is

21  dispositive. Id.  The court "should balance the factors permitting personal pursuits against

22  the factors restricting personal pursuits to determine whether the employee is so restricted"

23  that waiting time should be compensated.  Id.

24      Not all of the Owens factors are applicable to the instant case.  However, a number

25  of the Owens factors weigh heavily in Plaintiffs' favor.  For instance, Defendant claims that

26  Plaintiffs were not required to wait in the parking lot and that they were free to engage in

27  personal activities and then return to the parking lot at the newly-designated bus departure

28

1   time. However, many of the harvesters arrived at the parking lot on foot after walking across

2   the border (at least a 45 minute to an hour trip).  The harvesters are not able to venture far

3   because they are on foot and need to return to the parking lot within a hour or two.  The

4   harvesters certainly could not return home to spend time with their families.  Defendant

5   claims that many harvesters would go to the nearby Circle K for breakfast or coffee, or play

6   games such as dice or soccer.  These activities seem more akin to filling time rather than

7   participating in personal activities.  Plaintiffs certainly were not able to watch television, eat

8   breakfast at home with a spouse, take the children to school, do home or car repair, or other

9   things that would allow being at or near their home or community.

10          Thus, though there was no on-premises living requirement, there were excessive

11  geographical restrictions on the employee's movements.  In addition, because most

12  harvesters lacked transportation, the one to two hour return time was restrictive in that it

13  limited the distance they could travel and, consequently, the activities they could perform

14  during that time.  Even those with cars were limited in their activities because of the early

15  hour, that no stores were open at that time, and because of the amount of time it would take

16  for them to go home and then return to either the parking lot or the field.  Plaintiffs could not

17  trade their "on-call" responsibilities because, to do so would cost them a day's wages.  It

18  would not have been possible to ease Plaintiffs' burden by use of pagers or a phone tree

19  because often times by the time it would be plausible for Plaintiffs to get notification, they

20  were already at the parking lot.  Finally, again, the "personal activities" the harvesters

21  engaged in during this wait time seem more like time-filling activities, rather than personal

22  activities the harvesters would chose to do if they had not traveled to the parking lot in an

23  effort to work harvesting that day.  Thus, the evidence supports a finding that Plaintiffs were

24  unable to perform personal activities to the extent they would have had they not been

25  engaged to wait, either in the parking lot or in the field, for the fields to be ready for

26  harvesting.

27  ///

28

1

### 4.    BURDEN OF PROOF

2       Defendant also asserts that summary judgment is appropriate because Plaintiffs cannot

3   prove damages.  In support of it assertion, Defendant cites <u>Hearnsberger v. Gillespie</u>, 435

4   F.2d 926 (8th Cir. 1970) and <u>Anderson v. Mt. Clemens Potter Co.</u>, 328 U.S. 680 (1946).

5   However, both of these cases support shifting the burden of proof to Defendant.  Specifically,

6   <u>Hearnsberger</u> followed the holding in <u>Mt. Clemens Potter</u>, in which the Supreme Court stated

7   as follows:

8       An employee who brings suit under § 16(b) of the Act for unpaid minimum
        wages or unpaid overtime compensation, together with liquidated damages,
9       has the burden of proving that he performed work for which he was not
        properly compensated . . . .  Due regard must be given to the fact that it is the
10      employer who has the duty under § 11(c) of the Act to keep proper records of
        wages, hours and other conditions and practices of employment and who is in
11      position to know and to produce the most probative facts concerning the nature
        and amount of work performed.
12

13

14  <u>Mt. Clemens Potter</u>, 328 U.S. at 687-88.  The <u>Mt. Clemens Potter</u> Court further set forth that

15  in situations whereby an employer has not kept records of hours worked as required, the

16  employer

17      cannot object to the payment for the work on the most accurate basis possible
        under the circumstances.  Nor is such a result to be condemned by the rule that
18      precludes the recovery of uncertain and speculative damages.  That rule
        applies only to situations where the fact of damage is itself uncertain . . . . But
19      here we are assuming that the employee has proved that he has performed
        work and has not been paid in accordance with the statute.  The damage is
20      therefore certain.  The uncertainty lies only in the amount of damages arising
        from the statutory violation by the employer.  In such a case it would be a
21      perversion of fundamental principles of justice to deny all relief to the injured
        person, and thereby relieve the wrongdoer from making any amend for his acts
22      . . . . It is enough under these circumstances if there is a basis for a reasonable
        inference as to the extent of the damages.
23

24

25  <u>Id.</u> at 688 (internal quotations omitted).

26      Here, Plaintiffs have provided sufficient evidence to meet their burden.  Specifically,

27  Plaintiffs provide their testimony, as well as the Defendant's representatives' testimony,

28                                              - 21 -

showing that ice formed in the fields when the temperatures fell below 38 degrees.  As Plaintiffs have suggested, the number of days with temperatures below 38 degrees can be determined by referring to a weather almanac.  Moreover, nearly all Plaintiffs deposed, whose testimony is incorporated into the instant motions, have testified that they have had to wait for ice to melt before commencing work in the field.  Finally, a review of the time records Defendant produced reveals that on numerous days in the winter the harvest did not begin until later in the morning – 9:00, 10:00, or even 11:00 a.m.

Thus, the facts establish a reasonable inference as to the extent of damages. Therefore, the burden shifts to Defendant to establish the precise amount of work performed or evidence to negate the reasonableness of the inference to be drawn.  Defendant has not provided evidence to negate the reasonableness of the inference to be drawn.

### 5.   CONCLUSION

Accordingly, in considering the factors relevant to whether time spent waiting is compensable, the Court finds no genuine issue of material fact in dispute and grants Plaintiffs' Partial Motion for Summary judgment as to this issue.  Defendant's Motion for Summary Judgment is denied as to the issue of compensation for wait time.  Defendant is directed to determine the damages owed to Plaintiffs by making a good faith effort to calculate the hours Plaintiffs have waited for the ice to melt off the field for which they have not been paid.

### C.   MIGRANT   AND   SEASONAL AGRICULTURAL WORKER PROTECTION ACT

### 1.   BASIS OF PAY

The Agricultural Worker Protection Act ("AWPA") mandates that agricultural employers provide to each worker, for each pay period:  an itemized written statement that includes the basis on which wages are paid; the number of piecework units earned, if paid on a piecework basis; the number of hours worked; the total pay period earnings; the specific

1    sums withheld and the purpose of each sum withheld; and the net pay. 29 U.S.C. §§ 1821(d),

2    1831(c).

3         Plaintiffs assert that they are entitled to summary judgment on their AWPA claim

4    because the Defendant failed to include the basis of Plaintiffs' incentive pay in their pay

5    receipts in clear violation of AWPA.  Specifically, Plaintiffs claim that Defendant did not

6    include on Plaintiffs' pay receipts the rate of pay when Plaintiffs are compensated under the

7    Group Production Incentive ("GPI") rate.  Plaintiffs clarify that their total GPI earnings are

8    set forth but the actual rate per box, bin, or carton is not recorded on the receipt.

9         In support of their position, Plaintiffs cite Parez-Farias v. Global Horizons, 2007 WL

10   2041973 (E.D. Wash. 2007).  In Perez-Farias, the plaintiff agricultural workers alleged, *inter*

11   *alia*, a cause of action under AWPA for failing to provide adequate written pay statements.

12   Defendants distinguish Perez-Farias because there the plaintiffs were *only* paid on a

13   piecework basis and did not receive a guaranteed hourly wage.  Id. at *9.  Indeed, Perez-

14   Farias is distinguishable as the AWPA clearly states that the number of piecework units

15   earned must be included on each worker's pay stub *if paid on a piecework basis*.  29 U.S.C.

16   §§ 1831(c) 1821(d).[6]  The workers in Perez-Farias were paid only on a piecework basis.

17   Here, the harvesters earn an hourly wage and then receive a bonus over and above their

18   hourly wage if the group performance merited an additional incentive bonus.

19        Defendant asserts that Plaintiffs' itemized pay statements fully comply with AWPA

20   requirements.  Defendant argues that disclosure of the GPI rate on the pay statement was not

21   required because Plaintiffs were not paid on a piecework basis.  Defendant explains that

22

23        [6]  In a piece rate compensation system, workers earn their wages by the piece
     produced or harvested, *in lieu of* an hourly wage.  FLSA 29 U.S.C. §§ 206(a).  Federal law

24   and California law recognize that piece rate compensation replaces normal hourly wages.
     Id.; 8 CA ADC § 11140(2)(L).  Incentive bonuses are distinguishable from a piece rate

25   system of pay because the bonus provides earnings *in addition* to a base hourly rate of pay.
     The California Division of Labor Standards Enforcement Policies and Interpretation Manual

26   Section 2.5.5 defines a bonus as "money promised to an employee in addition to the monthly

27   salary, hourly wage, commission or piece rate usually due as compensation."

28

1   Plaintiffs earned the greater of a guaranteed hourly wage and a group incentive bonus (GPI),

2   which was paid if the group production exceeded the guaranteed hourly wage.  Moreover,

3   Defendant contends that the GPI rate was disclosed to each of the harvesters in writing at the

4   beginning of the season and were notified in advance of any GPI rate change during the

5   season.  In addition, the GPI rate was posted on company buses and provided in the bulletin

6   binder.

7       In their Reply, Plaintiffs appear to concede that the GPI pay is not a piecework rate

8   of pay.  Instead, Plaintiffs argue that GPI is still a "basis on which wages are paid" (29

9   U.S.C. § 1831(c)(1)(A)) and, as such, the rate must be included on pay statements.  The

10   AWPA, 29 § 1831(c)(1)(A), states that "[e]ach farm labor contractor, agricultural employer,

11   and agricultural association which employs any seasonal agricultural worker shall, with

12   respect to each such worker, make, keep, and preserve records for three years of . . . the basis

13   on which wages are paid."

14       The Court agrees that the GPI rate is a basis on which wages are paid and, pursuant

15   to 29 U.S.C. § 1831(c)(1)(A), it should be included on the harvesters' pay stub when the GPI

16   provides a basis upon which the harvester has been compensated.  Merely disclosing the GPI

17   rate at the beginning of the season and posting it generally on the bus and in the bulletin

18   binder are insufficient.  The AWPA requires that harvester's pay stubs include the basis on

19   which wages are paid.  Thus, any wages earned based on the GPI rate should be included on

20   each harvester's pay stub when he or she earns wages based on the GPI incentive.  Thus,

21   because there is no genuine issue of material fact, summary judgement is appropriate on the

22   portion of Plaintiff's AWPA claim requiring Defendant to include the basis of pay on payroll

23   receipts.

24              **2.       RECORD OF COMPENSABLE TIME**

25       Plaintiffs also assert that Defendant violated AWPA because it did not uphold its

26   affirmative duty to maintain accurate employee records, including employee compensable

27   time for the time they spent waiting for ice to melt off the fields.

28

In opposition to this point, Defendant simply states that "Plaintiffs' alleged wait time is not compensable work time, Defendant was not required to record it."  Response at p. 2. However, contrary to Defendant's statement, the Court determined above that Plaintiffs' wait time, in fact,  is compensable.

As the Court determined above, Plaintiffs are entitled to compensation for the time they spend waiting for ice to melt.  Therefore, pursuant to AWPA, Defendant was required to keep a record of this time.  See Medrano v. D'Arrigo Bros. Co. of California, 336 F.Supp.2d 1053, 1059 (N.D. Cal. 2004) (finding that an agricultural employer's failure to keep records of time that employees spent waiting for the employer's benefit violated AWPA).  Thus, summary judgment is also appropriate for Plaintiff on the portion of their AWPA claim dealing with Defendant's duty to record compensable time.

Accordingly, Plaintiffs' Motion for Summary Judgment of their AWPA claim is granted in accordance with this Order and Defendant's Motion for Summary Judgment of Plaintiffs' AWPA claim is denied.

### D.   ARIZONA WAGE PAYMENT ACT

In its Motion for Summary Judgment, Defendant argue that Plaintiffs have not presented any facts establishing that a discharged employee, or an employee who quit working for Defendant, was not timely paid all wages due and, therefore, Defendant is entitled to summary judgment as to Plaintiffs claim under the Arizona Wage Payment Act.

The statute provides in pertinent part as follows:

A.   When an employee is discharged from the service of any employer, he shall be paid wages due him within three working days or the end of the next regular pay period, whichever is sooner.

B.   When an employee quits the service of an employer he shall be paid in the usual manner all wages due him no later than the regular payday for the pay period during which the termination occurred.

To have a successful claim under the Arizona Wage Payment Act, Plaintiffs have the burden of proving that they performed work for which they were not properly compensated

1    by presenting evidence sufficient to provide a reasonable approximation or inference as to

2    the number of uncompensated work hours.  Hockersmith v. City of Patagonia, 123 Ariz. 559,

3    561, 601 P.2d 322 (App. 1979); Rural Fire Protection Co. v. Hepp, 366 F.2d 355, 359 (9th

4    Cir. 1966).

5         In their First Amended Complaint, Plaintiffs assert that Defendant violated A.R.S. §

6    23-353 by failing to pay all wages due and owing within the required time period.  However,

7    A.R.S. § 23-353 pertains to payment of wages for an employee who is discharged or quits.

8    Plaintiffs have alleged no facts to establish that Defendant has failed to compensate an

9    employee who has been discharged or has quit.  Accordingly, Defendant's Motion for

10   Summary Judgment is granted as to Plaintiffs' Arizona Wage Payment Act claim.

11        **E.    BREACH OF CONTRACT**

12        Defendant seeks summary judgment as to Plaintiffs' breach of contract claim.

Defendant contends that the parties agreed that wait time prior to starting work in the field

and wait time in connection with an Act of God or matters outside Defendant's control,

would not be compensated.  Plaintiffs contend that their arguments set forth under their

FLSA and AWPA claims also apply to their breach of contract claim.  Thus, Plaintiffs

contend, Defendant's failure to compensate Plaintiffs for the time they spent waiting is a

breach of their employment contract.

19        As stated above, an agreement to waive statutory wages under the FLSA is not

20   permissible.  Brooklyn Sav. Bank, 324 U.S. at 707.  In fact, such an agreement to waive

21   wages is contrary to the purpose of the FLSA.  Id.

22        Whether Defendant breached its employment contract with Plaintiffs is a fact-based

23   determination.  Moreover, the Court finds that genuine issues of material fact exist with

24   regard to whether Defendant breached its employment contract with Plaintiffs.  Accordingly,

25   Defendant's Motion for Summary Judgment is denied as to this cause of action.

26   ///

27   ///

28                                         - 26 -

1

## F.   CALIFORNIA LABOR LAWS AND REGULATIONS

2       Defendant argues that it is entitled to summary judgment as to Plaintiffs' California

3  Labor Laws and Regulations cause of action because, it asserts, there is no evidence in the

4  record to support a finding that Defendant willfully violated any California labor law or

5  regulation.  More specifically, Defendant contends that Plaintiffs were timely paid for all

6  work they performed in Imperial County, California, and any work offered to Plaintiffs in

7  California was completely voluntary, meaning that Plaintiffs were free to work, or not work,

8  in California as they pleased.  Plaintiffs, again, did not respond to this argument.

9       In their First Amended Complaint, Plaintiffs allege that Defendant willfully violated

10  California Industrial Welfare Commission and the Labor Code by failing to pay wages for

11  all hours worked, and by failing to pay minimum wage for uncompensated hours worked in

12  Imperial County, California.  Plaintiffs also allege that Defendant violated the Labor Code

13  by failing to pay wages when due.

14       Pursuant to the California Division of Labor Standards Enforcement Policies and

15  Interpretation Manual (the "Manual"), "hours worked" includes both "all time the employee

16  is suffered or permitted to work, whether or not required to do so," and all "time during

17  which an employee is subject to the control of an employer."  As with Federal labor law,

18  California law mandates a minimum wage.  See Cal. Labor Code § 1197.  Under the

19  California Labor Code Section 1194, "any employee receiving less than the legal minimum

20  wage or the legal overtime compensation . . . is entitled to recover in a civil action the unpaid

21  balance of the full amount of this minimum wage, including interest thereon, reasonable

22  attorney's fees, and costs of suit."  Further, under Cal. Labor Code § 1194.2, in any action

23  to recover unpaid minimum wages, an employee "shall be entitled to recover liquidated

24  damages in an amount equal to the wages unlawfully unpaid," unless the employer

25  demonstrates to the court that the omission was reasonable and in good faith.

26       Citing Section 45.1.5 of the California Division of Labor Standards Enforcement

27  ("DLSE") Policies and Interpretations Manual, Defendant asserts that "any delay in work due

28

to an Act of God, such as freezing temperatures and ice, is not compensable work time." Section 45.1.5 of the California, DLSE Policies and Interpretation Manual ("DLSE Manual") relates to interruption of work and states as follows:

> reporting time pay is not required when "the interruption of work (requiring the second reporting time) is caused by an Act of God or other cause not within the employer's control." DLSE has recently concluded that rain or other inclement weather that makes it impossible or unsafe to work falls into the category of "an Act of God or other cause not with in the employer's control." This means that if workers are sent home (either immediately upon reporting to work or during the workday) because of rain or other inclement weather, there is no obligation to pay reporting time pay.

Section 45.1.5 does not actually refer to freezing temperatures and ice as an Act of God. At any rate, Section 45.1.5.1 of the DLSE Manual continues on to state as follows:

> employees must be paid for all time they are restricted to the employer's premises, or worksite, while "waiting out" a delay caused by rain or other inclement weather, if they are not free to leave the premises or worksite during that time, even if the employees are relieved of all other duty during the period of time they are waiting for weather conditions to improve. . . .

The Court finds that Plaintiffs were under Defendant's control during the time Plaintiffs' spent in or near Defendant's parking lot and in the field waiting for the ice to thaw. Thus, Defendant is not entitled to summary judgment as to Plaintiffs' California Labor Laws and Regulations cause of action.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** granting Defendant's Motion to Strike portions of the affidavit testimony of Plaintiffs Manual Arce, Francisco Tapia, and Antonio Espinoza (Doc. 96).

**IT IS FURTHER ORDERED** overruling Plaintiffs' Objection to Carmen Ponce's Affidavit.

**IT IS FURTHER ORDERED** granting Plaintiffs' Motion for Leave to File an Objection to Mike Antle's Affidavit (Doc. 114).

1   **IT IS FURTHER ORDERED** overruling Plaintiffs' Objection to Mike Antle's

2   Affidavit (Doc. 115).

3   **IT IS FURTHER ORDERED** granting Plaintiffs' Motion for Partial Summary

4   Judgment (Doc. 74).  Plaintiffs are granted summary judgment as to their FLSA and AWPA

5   claims.

6   **IT IS FURTHER ORDERED** granting in part and denying in part Defendant's

7   Motion for Summary Judgment (Doc. 51).  Summary judgment is granted as to Plaintiffs'

8   Arizona Wage Payment Act claim.  Summary judgment is denied as to Plaintiffs' FLSA and

9   AWPA claims.   Summary judgment is denied as to Plaintiffs' breach of contract and

10  California labor laws and regulations claims.  The Court will set a status hearing to discuss

11  how it should proceed on the remaining claims.

12  DATED this 29th day of September, 2008.

13

14

15  _____

16  Mary H. Murguia
    United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

- 29 -